UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                                           :
ISRO KARAKUS, a/k/a KEVIN ISA KARAKUS :
                                                           :
and                                                        :
                                                           :
LALE KARAKUS,                                              :
                                                           :        MEMORANDUM AND ORDER
                                          Plaintiffs,      :
                                                           :        09-cv-4739 (ENV) (SMG)
               -against-                                   :
                                                           :
WELLS FARGO BANK, N.A.,                                    :
                                                           :
                                          Defendant.       :
                                                           :
---------------------------------------------------------- x

VITALIANO, D.J.

      Plaintiffs Lale Karakus and Isro Karakus, aka Kevin Isa Karakus ("the Karakuses")

brought this action against defendant Wells Fargo Bank, N.A. ("Wells Fargo") in connection

with a home mortgage refinancing. Plaintiffs assert federal claims as well as state statutory and

common law claims. As relief, they effectively seek to rescind two loans they received from

Wells Fargo in 2006 and to terminate the lien on their property. Plaintiffs also demand damages,

costs, and attorney's fees. Wells Fargo has moved to dismiss the entire complaint under Federal

Rule of Civil Procedure 12(b)(6). The Karakuses oppose, and have responded with a cross-

motion to join as a defendant Deutsche Bank National Trust Company ("Deutsche Bank") as

trustee for RBSGC 20070-B, which now holds one of the two loans, as well as a cross-motion

for leave to amend their complaint a second time with additional factual allegations.

      For the reasons discussed below, the Karakuses' cross-motion is granted insofar as it

joins Deutsche Bank as a defendant and includes new facts relevant to their Truth in Lending Act

1

("TILA") claim regarding the $265,000 mortgage refinancing loan. The cross-motion is otherwise denied. Wells Fargo's motion to dismiss is granted, although plaintiffs' TILA claim regarding the mortgage refinancing loan survives as against Deutsche Bank only.

## BACKGROUND

### I.    FACTUAL BACKGROUND[1]

In late August or early September 2006, Mrs. Karakus entered into discussions with Gene Lattanzi, a Wells Fargo employee, about refinancing the mortgage on her and her husband's Staten Island home. (First Am. Compl. (Dkt. No. 33) ¶¶5, 67-70). The Karakuses had previously received a mortgage loan on this property from Wells Fargo, which was in place when Mrs. Karakus and Lattanzi had their initial conversation about refinancing. (*Id.* ¶ 26). Multiple conversations regarding the terms of the refinancing arrangement followed prior to closing. (*Id.* ¶¶ 67-68). The deal closed on November 17, 2006. (*Id.* ¶¶ 5, 11, 16).

The transaction as structured included two new loans from Wells Fargo to Mrs. Karakus. (*Id.* ¶ 5). The first loan ("the mortgage refinancing loan") was a $265,000, 30-year loan at a fixed interest rate of 6.625%. (*Id.*) The proceeds were used to pay the $53,841.86 balance that remained on the Karakuses' existing mortgage loan ("the original mortgage loan"), in the original principal amount of $117,000. (Pl. Opp. Mem. at 4).[2] The second loan ("the home equity loan") was a $210,000, 15-year loan at a fixed interest rate of 8.875%, requiring a balloon

---

[1]    On a motion to dismiss, of course, the allegations in the complaint are deemed true and construed in the light most favorable to the complainant as the non-moving party. *See McBeth v. Gabrielli Truck Sales, Ltd.*, 731 F.Supp.2d 316, 319-20 (E.D.N.Y. 2010).

[2]    Despite the absence of these figures from the initial complaint, they are included in the proposed second amended complaint as well as the briefing papers. The Court shall allow plaintiffs to amend their complaint a second time in order to include them, as they relate to the issue of Wells Fargo's failure to disclose clearly the effects of TILA rescission.

payment of $167,583.79 at the end of the loan's term. (First Am. Compl. ¶¶ 5, 29). Although Mr. Karakus was initially (and incorrectly) listed as borrower on the home equity loan, Wells Fargo later corrected the error, and Mrs. Karakus is now listed as sole borrower on the two loans. (*Id.* ¶6).[3]

At the closing, the Karakuses signed various documents executing the transaction, including the loan application that Lattanzi had filled out for the borrowers. (*Id.* ¶¶ 5, 11, 16, 67; McKenney Decl. (Dkt. No. 22), Exhs. I-M). Neither of the Karakuses took the time to read the documents they signed; nor did they ask for an adjournment for that purpose. (First Am. Compl ¶¶ 16; Pl. Opp. Mem. (Dkt. No. 39) at 11-12). Although Wells Fargo had serviced the Karakuses' original mortgage, Lattanzi provided them with copies the notice of the right to cancel ("NRC") the mortgage refinancing loan on a TILA Model Form H-8, which applies to new relationship refinancing transactions, rather than a Model Form H-9, which applies to refinancing transactions with an existing creditor. (First. Am. Compl. ¶¶ 19-24, 50-51; McKenney Decl., Exh. I). Moreover, notwithstanding that plaintiffs signed statements attesting to the fact that they had received two copies each of the NRC form for the home equity loan, (McKenney Decl., Exh. K), they now allege that they received only one copy each. (First. Am. Compl. ¶¶ 32-33, 51).

Claiming TILA violations by Wells Fargo, the Karakuses purported to rescind the home equity loan by sending notices of rescission to the lender on June 24 and July 6, 2009. (*Id.* ¶¶ 34-35). On September 25, 2009, Wells Fargo assigned its interest in the mortgage refinancing loan to Deutsche Bank. (McKenney Decl., Exh. E). On October 6, 2009, the Karakuses also sought to rescind the mortgaging refinancing loan by sending notice of rescission to Wells Fargo. On

---

[3]    Both spouses, however, signed each loan's mortgage documents. (First Am. Compl. ¶7).

October 28, 2009, Deutsche Bank initiated an action in New York Supreme Court, Richmond County, to enforce the mortgage refinancing loan and foreclose on the Karakuses' home. *See Deutsche Bank National Trust Co. as Trustee for RBSGC 20070-B v. Karakus, et al.*, Index No. 131881/09.[4] (McKenney Decl., Exh. F). That action remains pending. (Def. Mem. (Dkt. No. 37) at 3).

## II.    PROCEDURAL BACKGROUND

On November 2, 2009, the Karakuses initiated this lawsuit, asserting federal causes of action under TILA and the Credit Repair Organizations Act ("CROA"), as well as state law claims under New York's Deceptive Practices Act ("DPA") and common law fraud. As relief, plaintiffs request that the Court enjoin the enforcement of their notes and mortgages and declare them unenforceable; that it terminate Wells Fargo's security interests in their home; and that it award damages, attorney's fees, costs, and other appropriate relief. (First. Am. Compl. ¶ 90, Request for Damages). Wells Fargo moved to dismiss pursuant to Rule 12(b)(6) (Dkt. Nos. 20). Plaintiffs not only opposed, but cross-moved to amend the pleadings. (Dkt. No. 26).

The Court granted plaintiffs' motion to amend and denied defendant's motion to dismiss. The Order granted 30 days leave to file the amended complaint. After plaintiffs filed their first amended complaint (Dkt. No. 33), defendant filed the instant motion to dismiss all claims. (Dkt. No. 36). Plaintiffs oppose defendant's motion and request leave to amend a second time. (Dkt. No. 42-43). Plaintiffs contend that their proposed amendments would augment their TILA allegations regarding the inadequacy of the NRC for the mortgage refinancing loan; present evidence of "widespread misfeasance" by Wells Fargo in its mortgage lending practices; specify injuries resulting from Wells Fargo's alleged fraud and DPA violation; and add a new basis for

---

[4]    The Court takes judicial notice of this action.

4

their fraud claim "stem[ming] from Wells Fargo's trying to make and then sell a large number of bad mortgage loans." (Dkt. No. 42 at 1-2). Plaintiffs also ask to join Deutsche Bank as a defendant, "since that entity now owns the $265,000 mortgage loan [they] seek to rescind under TILA," and to amend the pleadings accordingly. (*Id.* at 1). Wells Fargo opposes plaintiffs' request on grounds of prejudice, bad faith, undue delay, and/or futility. (Dkt. No. 44).

## DISCUSSION

### I.   STANDARD OF REVIEW

#### a.  *Rule 15(c)*

Under Federal Rule of Civil Procedure 15(c), leave to amend a pleading "shall be freely given when justice so requires." However, a trial court's discretion on this issue "is broad, and its exercise depends upon many factors, including undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , futility of amendment, etc." *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (internal quotations omitted).

#### b.  *Rule 19(a)*

Under Federal Rule of Civil Procedure 19(a), the Court must join a party in the following circumstances:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

#### c.  *Rule 12(b)(6)*

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient

5

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim includes factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. It is the factual allegations that are paramount; "a complaint need not pin plaintiff's claim for relief to a precise legal theory," nor does it require "an exposition of [the complainant's] legal argument." *Skinner v. Switzer*, 131 S.Ct. 1289, 1296 (2011). A court must presume the truth of all factual allegations in the complaint for purposes of Rule 12(b)(6) and draw all reasonable inferences in favor of the plaintiff. *See Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 591–92 (2d Cir. 2007). However, a court need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Moreover, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal citations and quotations omitted).

## II.    The Cross-Motions

The Karakuses move to amend their complaint a second time in order to:

1. provide additional facts that "speci[y] Wells Fargo's alleged failure to disclose clearly the effects of TILA rescission;"

2. add Deutsche Bank as a defendant, "since that entity now owns the $265,000 mortgage [refinancing] loan the Karakuses seek to rescind under TILA;"

3. "present[] evidence of widespread misfeasance by Wells Fargo in its mortgage lending to thousands of consumers" as part of their Deceptive Practices Act claim;

4. "speci[y] two injuries that the Karakuses have suffered from Wells Fargo's violating the Deceptive Practices Act and committing fraud," namely injury to credit standing and the foreclosure of their home; and

> 5. "explain[] that the Karakuses' fraud claim stems from Wells Fargo's trying to make and then sell a large number of bad mortgage loans," which Wells Fargo would then securitize and sell.

(Pl. Mot. to Amend at 1-2). Wells Fargo opposes on grounds of undue delay, undue prejudice, bad faith, and the futility of the amendments in "remedy[ing] the fatal deficiencies in the Karakuses' First Amended Complaint." (Def. Opp. to Pl. Mot. to Amend at 2-3). Setting aside all else, the proposed amendments, for the most part, score exceedingly high on the futility meter. *See Jones v. N.Y. Div. of Military and Naval Aff.*, 166 F.3d 45, 50 (2d Cir. 1999) ("[A] district court may properly deny leave when amendment would be futile.").

Proposed amendments one and two, however, pertain in part to plaintiffs' TILA claim regarding the mortgage refinancing loan, which, as discussed *infra*, survives as against Deutsche Bank. Amendment one would simply enlarge the factual assertions regarding that claim. Amendment two would join as a defendant Deutsche Bank, to which Wells Fargo assigned the mortgage refinancing loan in September 2009. The parties both agree that Deutsche Bank should be joined, although Wells Fargo nonetheless objects to these amendments. (*See* Pl. Mot. to Amend at 2; Def. Mem. at 9 n.12; Pl. Opp. Mem. at 17). As the current owner of the mortgage refinancing loan, Deutsche Bank is the only party that can be ordered to remove the lien on the Karakuses' home. Deutsche Bank is therefore an indispensable party within the meaning of Rule 19(c), since complete relief cannot be accorded to the Karakuses without Deutsche Bank's participation in the litigation.

Accordingly, permitting amendments one and two would not be futile. Furthermore, although plaintiff's revamped TILA claim regarding the mortgage refinancing loan survives, Wells Fargo, by the same token, is dismissed from the case, since it no longer possesses any interest in that loan (*see* discussion, *infra*). Its objections to these amendments based on

7

prejudice, bad faith and undue delay are therefore moot. None of these grounds bar joiner and amendment as to the newly added Deutsche Bank.

### III. TILA Claims

#### a. *TILA Framework*

Congress enacted TILA, 15 U.S.C. §§ 1601-67f, "'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" *Poulin v. Balise Auto Sales, Inc.*, 647 F.3d 36, 39 (2d Cir. 2011) (quoting 15 U.S.C. § 1601(a)). "TILA endeavors to enable consumers to evaluate credit offers separately from the purchase of merchandise, and thereby to create an active market providing more efficient credit prices." *Poulin*, 647 F.3d at 39 (internal quotations omitted). Congress has "specifically designated the Federal Reserve Board ['the Board'] and staff as the primary source for interpretation and application" of TILA, *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980), and the Board issues rules and regulations implementing the statute at 12 C.F.R. Pt. 226 (also known as "Regulation Z").

To advance these goals, TILA mandates that any individual who receives consumer credit in exchange for a security interest in his or her principal place of dwelling "shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the [required] information and rescission forms . . . whichever is later." 15 U.S.C. § 1635(a). A borrower exercises the right to rescind by "notify[ing] the lender of the rescission by mail, telegram or other means of written communication," 12 C.F.R. § 226.23(a)(2), and "[a lender's] failure to respond to a valid notice of rescission within twenty days of receipt is a separate violation of TILA," giving rise to a cause

8

of action for damages. *Midouin v. Downey Sav. and Loan Ass'n, F.A.*, 834 F.Supp.2d 95, 108-09 (E.D.N.Y. 2011) (citing 15 U.S.C. §§ 1635(8), 1640(a), (e)).

Under the statute, a lender must "clearly and conspicuously disclose" a borrower's right to rescind and must provide "appropriate forms for the obligor to exercise his right." 15 U.S.C. § 1635(a). Regulation Z requires a lender to "deliver two copies of the notice of the right to rescind [i.e., the NRC] to each consumer entitled to rescind." 12 C.F.R. § 226.23(b)(1). This notice must "clearly and conspicuously disclose" the following:

(i)   The retention or acquisition of a security interest in the consumer's principal dwelling.

(ii) The consumer's right to rescind the transaction.

(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(iv) The effects of rescission, as described in paragraph (d) of this section.

(v) The date the rescission period expires.

*Id.* To satisfy this requirement, "the creditor shall provide the appropriate model form in Appendix H of this part or a substantially similar notice." *Id.* § 226.23(b)(2). A creditor's failure to provide the required notice or material disclosures shall extend the period of rescission from three days to three years. *Id.* § 226.23(a)(3); 15 U.S.C. § 1635(f). However, TILA's statute of limitation for damages remains fixed at one year following the alleged violation. 15 U.S.C. § 1640(e). *See Owens v. Aspen Funding LLC*, No. 08–CV–6588 (CJS), 2011 WL 4024820, at *10 (W.D.N.Y. Sep. 9, 2011) (finding a TILA claim for rescission timely but a claim for damages time-barred); *Beach v. Ocwen Federal Bank*, 523 U.S. 410, (1998) (noting TILA's "quite different treatment" of claims requesting rescission and those requesting damages).

### b. Statutory Damages Under TILA

At the outset, it must be noted that plaintiffs have demanded both rescission and damages under TILA. The statue requires "a borrower seeking damages . . . [to] file an action 'within one year from the date of the occurrence of the violation.'" *Midouin*, 834 F.Supp.2d at 108 (citing 15 U.S.C. § 1640(e)). Plaintiffs allege TILA violations that occurred at the November 17, 2006 closing. Hence, the limitations period for any claim for damages expired on November 17, 2007. Because plaintiffs did not file suit until November 2, 2009, such claims are time-barred. To the extent the proposed second amended complaint seeks to replead or advance such claims, leave is denied and the demand for TILA damages is dismissed.

### c. TILA Claim Regarding the Mortgage Refinancing Loan

The Karakuses allege that Wells Fargo violated TILA and its implementing regulations by providing them with notice of the right to cancel the mortgage refinancing loan on a TILA Model Form H-8 rather than Model Form H-9. The error, they urge, warrants a court-ordered rescission of that loan. Error does seem apparent. As *Barrett v. Bank One, N.A.*, 511 F.Supp.2d 836, 837-38 (E.D. Ky. 2007) explains, "Form H-8 is typically used in connection with the first-time purchase of a home, while [F]orm H-9 is contemplated for use in connection with refinancing."

According to plaintiffs, the difference between these two notices is not merely formal, but is, in fact, functional. They argue that "Model Form H-8 erroneously told [them] that they could cancel the entire $265,000 loan, because it states that: 'You are entering into a transaction that will result in a [mortgage on] your home. You have a legal right under federal law to cancel *this transaction*, without cost, within three business days . . . .'" (Pl. Opp. Mem. at 6 (quoting 12 C.F.R. Pt. 226, Appendix H, Model Form H-8) (emphasis added)). Plaintiffs contend that "this

transaction" refers to (or appears to refer to) the entire $265,000 loan. (Pl. Opp. Mem. at 4-6).

However, $53,841.86 of this amount represented the balance on their original mortgage loan—an

amount they could not rescind. *See* 15 U.S.C. § 1635(e)(2); 12 CFR § 226.23(a)(3) (a borrower's

right to rescind a refinancing loan extends only to that portion of the loan that exceeds any

unpaid balance, finance charges, and other costs on a pre-existing loan by the same creditor).

"Therefore," plaintiffs argue, "Wells Fargo did not tell them they could not cancel $53,841.86 of

their $265,000 loan because $53,841.86 of the loan was not new credit, but was the remaining

balance on their previous loan." (Pl. Opp. Mem. at 6).

However, "had Wells Fargo used a form H-9," they point out, "it would have accurately

informed the Karakuses of their cancellation rights, because H-9 states: 'If you cancel this new

transaction, *it will not affect the amount you presently owe*'"—that is, the $53,841.86 balance

from the original mortgage loan. (*Id.* at 6 (quoting 12 C.F.R. Pt. 226, Appendix H, Model Form

H-9) (emphasis added)). As a result, plaintiffs contend that Wells Fargo's use of the H-8 rather

than the H-9 Form in this instance violated 12 C.F.R. § 226.23(b)(1)(iv)'s requirement that the

mandatory notice of the right to rescission "clearly and conspicuously disclose . . . the effects of

rescission."

Wells Fargo vigorously disputes this interpretation of TILA and Regulation Z. First, it

cites language in the statute clarifying that "nothing in this subchapter may be construed to

require a creditor or lessor to use any such model form or clause prescribed by the Board under

this section." 15 U.S.C. § 1604(b). Rather, a creditor can provide the NRC on "[a] form or

written notice published and adopted by the [Board,] *or a comparable written notice*." *Id.* §

1635(h) (emphasis added); *see* 12 C.F.R. § 226.23(b)(2) ("To satisfy the disclosure requirements

. . . the creditor shall provide the appropriate model form in Appendix H of this part *or a*

*substantially similar notice.*") (emphasis added). Wells Fargo argues that the NRC forms it provided *were* substantially similar to Regulation Z's appropriate model form because they disclosed (1) that the loan would result in a security interest on the Karakuses' home; (2) that they would have a right to rescind the loan; (3) that they could rescind by following specified steps; (4) that rescission would cancel the security interest and oblige them to return the loan proceeds; and (5) that the right to rescind would expire on midnight on November 21, 2006. (Def. Mem. at 7).

Wells Fargo further argues that the form it used was, in fact, materially accurate by informing that rescission *would* cancel the entire $265,000 mortgage refinancing loan—thereby nullifying "this transaction"—but "would not impact the original mortgage loan (the remaining balance of which was $53,841.86) or the security interest therein." (Def. Reply (Dkt. No. 41) at 2) (citing *Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d 12, 17-18 (1st Cir. 2007)). In essence, defendant seeks refuge in the argument that, because rescission would effectuate a return to the pre-refinancing status quo, it was "not [obliged to] inform the Karakuses that if they rescinded the refinance loan, the original mortgage balance would remain." (Def. Reply at 2). The argument dangles from a hook in the Form H-8 language, which Wells Fargo asserts "makes clear that 'rescission would only operate as to their pending refinance transaction,'" and consequently, "'any conclusions that [plaintiffs] might have drawn from that disclosure about their previously existing mortgages were unreasonable (and thus not a valid basis for any TILA claim).'" (*Id.* (quoting *Santos-Rodriguez*, 485 F.3d at 18)).

As the briefing reveals, the case precedent on this question is decidedly mixed. Plaintiffs rely heavily on *Porter v. Mid-Penn Consumer Discount Co.*, 961 F.2d 1066 (3d Cir. 1992), which presented similar facts. In *Porter*, the Third Circuit considered whether an H-8 Form

12

sufficiently disclosed the "effects of rescission" to a borrower whose second mortgage loan satisfied the remaining balance on her initial mortgage loan from the same lender (an amount she could not rescind) and also advanced her new money (an amount she could rescind). *Id.* at 1073-78. The *Porter* court found that the term "this transaction" as it appears in the H-8 Form could plausibly refer *either* to the entire portion of the funds advanced in the refinancing arrangement—both the "old money" and "new money" components—*or* only to the portion of the funds that exceeded what the borrower already owed to that same lender—just the "new money" component. *Id.* at 1077. In line with this reading, a reasonable borrower in the Karakuses' position might not understand the implications of rescission, and might wrongly interpret this language to grant her the right to cancel both the "old money" and "new money" portions of her refinanced loan, when in fact she could only rescind the "new money" component under 15 U.S.C. § 1635(e)(2) and 12 CFR § 226.23(a)(3). *Id.* Due to this ambiguity, the Third Circuit held that the lender had not provided clear and conspicuous notice of the effects of rescission, finding that "a lender violates TILA by providing the H-8 notice when the borrower's right to rescind is limited by the 'refinancing' exception of 15 U.S.C. § 1635(e)(2)." *Id.*

Also on point is *Handy v. Anchor Mortg. Corp.*, 464 F.3d 760, 762 (7th Cir. 2006), in which the plaintiff had refinanced her home with a second mortgage loan for $80,500 from a new lender. All but approximately $5,500 of the new loan went to paying off the borrower's existing mortgage. *Id.* At closing, the lender provided NRC on *both* the H-8 and H-9 forms. *Id.* at 762-63. In seeking to rescind outside the three-day window, the plaintiff argued that the receipt of two forms created confusion as to whether she could cancel the entire $80,500 loan (as the H-8 Form implied) or only the $5,500 in new money that exceeded the existing $75,000 mortgage balance (as the H-9 Form implied). *Id.* at 763. The Seventh Circuit agreed with the borrower,

13

citing *Porter* for the proposition that "where more than one reading of a rescission form is 'plausible,' the form does not provide the borrower 'with a clear notice of what her right to rescind entail[s].'" *Id.* at 764 (quoting *Porter*, 961 F.2d at 1077). *See also Harris v. OSI Finan. Services, Inc.*, 595 F.Supp.2d 885, 891-92 (N.D. Ill. 2009) (holding that "an ordinary consumer" could glean incorrect information from an H-9 Form when an H-8 Form should have been provided); *Gibbons v. Interbank Funding Grp.*, 208 F.R.D. 278, 282-83 (N.D. Cal. 2002) (rejecting defendant's argument that an H-9 Form is "substantially similar" to an H-8 Form).

Fighting fire with fire, defendant cites cases that directly contradict the holdings in *Porter* and *Handy*. In *Santos-Rodriguez*, 485 F.3d at 17, the First Circuit concluded that a creditor who had supplied an H-8 Form in a same-lender mortgage refinancing arrangement had "clearly stated that rescission was available only as to 'this transaction,'" and had thus "clearly and conspicuously informed plaintiffs that any rescission would only operate as to the current refinancing transaction," rather than to any balance they still owned on their existing mortgage loan. The court noted that the information in the H-8 Form was "accurate even in same-lender refinance transactions," since "rescission of a refinance transaction does indeed cancel the entire security interest contemplated by the refinance agreement" but "does not impact the lender's security interest under the original loan, which is held in abeyance until the rescission period has expired." *Id.* at 17-18. Acknowledging that an H-9 Form would have more fully explained to plaintiffs that "rescission of the refinance transaction would not also rescind their original mortgage," the court held that, nonetheless, "perfect disclosure" is not necessary under TILA, and that the use of an H-8 form "met the requirements of the clear and conspicuous standard laid out in Regulation Z." *Id.* at 18. Wells Fargo cites similar holdings in *Veale v. Citibank, FSB*, 85 F. 3d 577 (11th Cir. 1996) and *Mills v. Equicredit Corp.*, No. 05-1088, 2005 WL 455158, at *4

(6th Cir. Feb. 24, 2006). *See also, e.g., Watkins v. SunTrust Mortg.*, Inc., 663 F.3d 232, 238-39 (4th Cir. 2011); *Kahraman v. Countrywide Home Loans, Inc.*, No. 09–CV–2970 (RRM) (RML), 2012 WL 3258623, at *6 (E.D.N.Y. Aug. 08, 2012); *Gewecke v. U.S. Bank, N.A.*, Civ. No. 09– 1890 (JRT/RLE), 2010 WL 3717273, at *15-*17 (D. Minn. June 16, 2010) (all holding similarly).

In the absence of binding Second Circuit precedent, and against the backdrop of contradictory precedent elsewhere, the Court finds the *Porter* and *Hardy* line of reasoning advanced by plaintiffs more persuasive. As the Karakuses correctly note, the differences between the H-8 and H-9 templates are not merely formal or clerical, but are in fact substantive and tangible. The H-8 Form states that the borrower is "entering into a transaction that will result in a [mortgage/lien/security interest] [on/in] your home," that she may "cancel this transaction" within the time specified, and that "if [she] cancel[s] the transaction, the [mortgage/lien/security interest] is also cancelled." 12 C.F.R. Pt. 226, Appendix H, Model Form H-8. By contrast, the H-9 Form makes clear that the borrower is "entering into *a new transaction* to increase the amount of credit previously provided," that the borrower may rescind "this *new* transaction," and that rescission "*will not affect any amount that [she] presently owe[s]*." 12 C.F.R. Pt. 226, Appendix H, Model Form H-9 (emphasis added). Moreover, the H-9 Form explains to the borrower that "[y]our home is security for that amount" that will remain in the event that the borrower rescinds the newly-advanced funds. *Id.* The H-8 form says nothing about the fact that the new transaction will increase the amount of credit previously provided (along with indebtedness), that rescission will leave undisturbed the balance on the original loan, and that the creditor will retain a security interest in the borrower's home in the amount of the remaining balance. These differences go directly to material and distinct credit and financial ramifications inherent in two different kinds

of transactions, as well as two very different post-rescission consequences that a borrower may confront.

Defendant points out that the H-8 Form is technically accurate in that the Karakuses were, indeed, permitted to rescind "this transaction"—the entire $265,000 mortgage refinancing loan—within the three-day window provided, and that the $53,841.86 remaining on their original mortgage loan was actually part of a *different* transaction not encompassed by the phrase "this transaction." Although some of the decisions cited *supra* adopted this reasoning, *see, e.g., Santos-Rodriguez* 485 F.3d at 17-18, the Court declines to do so here. TILA is "a remedial statute . . . [to] be construed liberally in favor of the consumer." *Kurz v. Chase Manhattan Bank*, 273 F.Supp.2d 474, 477 (S.D.N.Y. 2003). Therefore, its construction and application should adhere to "the sound tenet that courts must evaluate the adequacy of TILA disclosures from the vantage point of a hypothetical average consumer—a consumer who is neither particularly sophisticated nor particularly dense." *Palmer v. Champion Mortg.*, 465 F.3d 24, 28 (1st Cir. 2006).

From the perspective of an ordinary consumer, *Porter* correctly observes that the H-8 Form's reference to a borrower's right to "cancel this transaction" provides for two quite sensible but competing interpretations: either that rescission would nullify both the "old money" and "new money" components of the loan (the incorrect reading), or that rescission would only nullify the "new money" component while leaving in place the "old money" component (the correct reading). A judge examining the language *post hoc* might, of course, rule out the former interpretation; but that interpretation remains nonetheless plausible to a consumer trying to decipher the disclosure materials provided expressly to help him evaluate a loan agreement *before* he enters into it.

The differences between the H-8 and H-9 forms are seen in stark relief when considered through the eyes of the average consumer. For instance, a mortgagor refinancing his loan might presume that his existing loan had been fully and permanently extinguished by the second loan, and that rescinding "this transaction"—that is, the new loan—would not or could not revive the earlier balance. Or he might realize that rescinding his new loan would revive his obligation to pay off the balance of the original loan, but might not know that it would also revive the lender's security interest in his property. Finally, given the nebulous and sometimes confusing relationships between affiliated lending institutions, a borrower might not know whether he had entered into a "same lender" refinancing arrangement (and could thus rescind only the "new money" he had received) or a "different lender" arrangement (in which case he could rescind both the "new" and "old money"). To accept defendant's argument would place the burden of understanding the complexities of home mortgage refinancing largely on the borrower and would require him to intuit the consequences of a pending transaction. That outcome would clash with TILA's goals of "assur[ing] meaningful disclosure of credit terms" and "avoid[ing] the uninformed use of credit," *McAnaney v. Astoria Fin. Corp.*, 357 F.Supp.2d 578, 583 (E.D.N.Y. 2005), a clash made avoidable by a readily available alternate disclosure notice.

Wells Fargo decries application of *Porter*'s reasoning on three grounds. First, it claims that the plaintiffs in *Porter* had stated with precision the TILA violation they were alleging—that the lender "had failed to disclose clearly the effects of rescission"—whereas plaintiffs do not spell this out in their first amended complaint. (Def. Reply at 1-2). This string on the argument bow amounts to little more than a wooden attack on the pleadings. The nature of the Karakuses' TILA claim is clear from their complaint, which "need not pin [plaintiffs'] claim for relief to a precise legal theory" nor offer "an exposition of [their] legal argument." *Skinner*, 131 S.Ct. at

1296. Rather, a complaint need only provide "a plausible 'short and plain' statement of the plaintiff's claim," *id.* (citing Fed. R. Civ. P. 8(a)(2)), which the Karakuses have done here. In any event, the Court will permit the plaintiffs to amend their complaint a second time to amplify their claim on this point.

Next is the charge that the Third Circuit predicated its holding in *Porter* on "a system of strict liability in favor of the consumers when mandated disclosures have not been made," a proposition it claims the Second Circuit rejected in *Gambardella v. G. Fox & Co.*, 716 F.2d 104 (2d Cir. 1983). This assertion confuses the relative gravity of the alleged violation with the violator's state of mind. In *Gambardella*, the Second Circuit made clear that technical errors or inconsistencies in TILA disclosure forms that are unlikely to confuse or mislead customers do not violate the statute. 716 F.2d at 117-118. "TILA . . . does not require perfect disclosure," as the court noted, "but only disclosure which clearly reveals to consumers the cost of credit." *Id.* at 118. The Third Circuit, however, mentioned strict liability in *Porter* not to comment on the weight or significance of the violation in question, but rather to affirm that a lender may violate TILA regardless of intent,[5] and regardless of whether the plaintiff was actually affected by the violation.

Confusion on this point is understandable; several prior decisions have used the term "strict liability" to refer to the tendency in some quarters to consider any degree of non-

---

[5]  Such a strict liability standard cannot, in any event, stand. 15 U.S.C. § 1640(c) releases creditors from liability under TILA if they can "show[] by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." However, at this stage in the litigation, neither party has raised the issue of Wells Fargo's intent or lack thereof with regard to the violation in question, nor of Wells Fargo's maintenance of procedures reasonably adapted to avoid TILA violations. As such, the Court declines to consider those issues now.

compliance whatsoever to constitute an actionable TILA violation. *See, e.g., Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 311 (S.D. Fla. 2001) ("TILA is a strict liability statute with respect to imposition of statutory damages: 'once a court finds a violation, *no matter how technical*, it has no discretion with respect to the imposition of liability.'") (quoting *Grant v. Imperial Motors*, 539 F.2d 506, 510 (5th Cir. 1976) (emphasis added in *Fabricant*)); *Kahraman*, 2012 WL 3258623, at *5 n.4 (recognizing, but "declining to follow, those other courts that have applied a strict liability standard, to TILA, such that even minor or technical violations impose rescission liability on the creditor") (internal quotations omitted). Indeed, the very case that *Porter* quotes seems to suggest this, *see Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 896, 898 (3d Cir.1990), even while *Porter's* actual holding does not hinge on the proposition that "hypertechnicality reigns" in TILA cases. *See Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995).

Wells Fargo is correct, though, in observing that the Second Circuit appears to have rejected the "hypertechnicality" standard: *Gambardella* dispensed with any claim that TILA mandates "perfect disclosure," finding instead that it only requires "disclosure which clearly reveals to consumers the cost of credit." 716 F.2d at 117-118. *See Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 457 (2d Cir. 1999) (TILA requires "meaningful disclosure," not "more disclosure") (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980)). Yet, Wells Fargo's argument fails even under the more lenient "clear disclosure" standard. The differences between the H-8 and H-9 Forms, as noted earlier, are not mere technicalities, but could have a material impact on an ordinary consumer's understanding of a transaction such as the one at issue in this case.

Lastly, Wells Fargo suggests that *Porter* is no longer good law in light of Congress's

1995 amendments to the statute. *See* Truth in Lending Act Amendments of 1995, Pub. L. No.

104-29, 109 Stat 271 (1995). It argues that these amendments "'set higher tolerance levels for . . .

honest mistakes in carrying out disclosure obligations' and [were] 'aimed at preventing creditors

from facing overwhelming and draconian liability (rescission) for relatively minor violations.'"

(Def. Reply at 3 (quoting *Peterson-Price v. U.S. Bank Nat'l Ass'n*, No. 09-495 ADM/JSM, 2010

WL 1782188, at *6 (D. Minn. May 4, 2010)). That is hardly the only view of the amendments,

nor the most compelling one. The focal point is 15 U.S.C. § 1635(f), which provides that

> [a]n obligor shall have no rescission rights arising solely from the form of written
> notice used by the creditor to inform the obligor of the rights of the obligor under
> this section, if the creditor provided the obligor the appropriate form of written
> notice published and adopted by the Bureau, or a comparable written notice of the
> rights of the obligor, that was properly completed by the creditor, and otherwise
> complied with all other requirements of this section regarding notice.

Importantly, the plausibility of the Karakuses' claim does not hang on the lender's use of the

wrong form. It was not required to use either form. Rather, plausibility stems from the *language*

in the H-8 form that it chose to use, which failed to disclose in clear and conspicuous terms the

effects of rescinding the loan. In other words, the form did not "otherwise compl[y] with all other

requirements of [TILA] regarding notice," *id.*, and thus failed to meet the standards of TILA

even in light of the 1995 amendments.

The Fourth Circuit's holding in *Watkins* provides some comfort to Wells Fargo. There,

the court ruled that an H-8 form is acceptable notice in same-lender mortgage refinancing

transactions because TILA permits lenders to "modif[y] the Board's form by 'deleting any

information which is not required by this subchapter.'" *Watkins*, 663 F.3d at 238 (citing 15

U.S.C. § 1604(b)) (alterations removed). Yet, *Watkins* ignores the statute's subsequent

qualification that a lender may only make such a modification if it "*does not affect the substance,

clarity, or meaningful sequence of the disclosure.*" 15 U.S.C. § 1604(b) (emphasis added). As

discussed *supra*, the Karakuses received notice that did not include key sentences that would have appeared in an H-9 Form, and this omission *did* affect the substance and clarity of the disclosure. Furthermore, § 1604(b) permits lenders to make alterations to boilerplate language when using an "*appropriate* model form." *Id.* (emphasis added). Here, the "appropriate" form would have been the H-9, not the H-8. The comfort Wells Fargo might take in *Watkins* is cold.

It must be acknowledged that a recent decision issued in this district arrived at the opposite conclusion, holding that "the average refinancing borrower would understand rescission of a refinancing 'transaction' to return them to the *status quo ante* of their outstanding mortgage, and not to grant them a windfall by cancelling their entire mortgage." *Kahraman*, 2012 WL 3258623, at *6. This Court respectfully takes a different view of TILA. As discussed previously, and particularly with respect to an average consumer, the effects of rescinding a mortgage refinancing transaction are not readily predictable because multiple and divergent consequences might reasonably be conjured. TILA requires clear notice to eliminate the need for conjecture.

Moreover, neither Wells Fargo nor the *Kahraman* court grapple with a simple but critical question: if the language of the H-8 Form provided sufficient notice to borrowers such as the Karakuses, why did the Federal Reserve Board—the "primary source" for interpreting and applying TILA—create an H-9 Form at all? The Board drafted the H-9 to include clear and intelligible language explaining to a borrower that the "old money" component of his pending loan (as well as the lender's security interest in his home) would remain after he rescinded any "new money" component. The Board deemed these facts significant enough to necessitate a separate form making those effects explicit for the borrower's benefit. To accept Wells Fargo's argument would render the language unique to the H-9 mere surplusage and the Board's decision to draft that form nugatory.

Consequently, the Court holds that the Karakuses have stated a claim under TILA because they have alleged facts that, if proven, would demonstrate that Wells Fargo failed to clearly and conspicuously disclose the effects of rescinding the mortgage refinancing loan. Wells Fargo's motion to dismiss this charge is denied. [6]

### d. TILA and the Home Equity Loan

Plaintiffs also claim that Wells Fargo violated TILA with regard to the home equity loan and seek a court-ordered rescission of that transaction as well. Here, the Karakuses do not claim that Wells Fargo provided them with a substantively deficient notice of the right to cancel the home equity loan. Rather, they allege that Wells Fargo provided only one copy of the NRC to each spouse (two copies in total); not the two copies apiece (four in total) that Regulation Z specifies. (First. Am. Compl. ¶¶ 30-34, 49-52). *See* 12 C.F.R. § 226.23(b)(1) ("In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind . . . .").

Wells Fargo responds that each plaintiff "expressly acknowledged that he or she received two copies of the 'Notice of Right to Cancel' document." (Def. Mem. at 8). It includes as exhibits to its briefing papers photocopies of the actual NRC forms provided to each spouse, on which "[t]heir signatures appear directly underneath the statement '[y]ou acknowledge receipt of two copies of this Notice of Right to Cancel and one copy of the Truth in Lending disclosures.'"

---

[6] As a supplemental argument, Wells Fargo suggests that the Karakuses should be denied rescission because they would be required to return the money that Wells Fargo loaned them, but are "presumably . . . unable to repay the loans." (Def. Mem. at 9 (citing *Moazed v. First Union Mortg. Corp.*, 319 F. Supp.2d 268, 272 (D. Conn. 2004) (declining on equitable grounds to order rescission under TILA because the plaintiff clearly could not repay the loan principal to the lender))). Of course, if the Karakuses were unable to repay the funds they received, any remedy would be subject to the equitable principals stated in *Moazed*. However, the current state of the Karakuses' finances is a factual question, and the Court declines to consider this issue on a motion to dismiss.

(*Id.* (alterations in original); McKenney Decl., Exh. K). Arguing that "a court need not feel constrained to accept as truth conflicting pleadings that . . . are contradicted either by statements in the complaint itself or by documents on which the pleadings rely," *Deronette v. City of New York*, No. 05-CV-5275 (SJ), 2007 WL 951925, at *2 (E.D.N.Y. Mar. 27, 2007) (internal quotations omitted), Wells Fargo urges the Court to reject plaintiffs' factual contentions and dismiss this count. (Def. Mem. at 8 (citing cases)).

In response, the Karakuses assert that an individual's signature attesting to a statement "only creates a rebuttable presumption that the statement is true," and that a TILA plaintiff can overcome this presumption by testifying otherwise in an affidavit. (Pl. Opp. Mem. at 11, 12-3 (citing cases)). Mrs. Karakus has submitted an affidavit retracting her earlier signed statement and explaining that a search of her home records (in which she claims to have kept all of the closing documents) revealed that she and her husband received only one copy apiece of the required NRC. (Lala Karakus Aff. (Dkt. No. 24) ¶¶ 12-23, 32-36). Wells Fargo, in turn, retorts that this testimony is insufficient to rebut the presumed truth of the signed acknowledgement because "[t]he Karakuses do not allege that they actually recall receiving only one copy each of the [NRC] at closing." (Def. Reply. at 4). *Seeo Gaona v. Town & Country Credit*, No. 01-44-PAM/RLE, 2001 WL 1640100, at *3 (D. Minn. Nov. 20, 2001), *rev'd in part on other grounds*, 324 F.3d 1050 (8th Cir. 2003) ("[A]n allegation that the notices are now not contained in the closing folder is insufficient to rebut the presumption [of] delivery. There are any number of explanations for the missing notices."). Wells Fargo also reiterates its argument that rescission is inappropriate in any event because the Karakuses could not repay the loan principal, as TILA would require them to do if they were to rescind. (*See* Def. Mem. at 8; *see also supra*, note 6).

There is, however, a more fundamental, and fatal, flaw in plaintiffs' claim. The Court

holds that, as a matter of law, a lender does not violate TILA or Regulation Z merely by providing the borrower with one rather than two copies of an otherwise sufficient NRC. It is appropriate to observe once again that TILA's watchword is clear and conspicuous disclosure. For a lender to provide a borrower with just one copy of an NRC form rather than two copies has minimal, if any, bearing on the clarity or conspicuousness of the disclosure; it is nothing more than a *pro forma* error. This stands in stark contrast to plaintiffs' other TILA claim, which concerns the substantive shortcomings of the notice that Wells Fargo provided the Karakuses in order to help them evaluate a pending credit transaction. The provision of one NRC form as opposed to the simultaneous delivery two copies of the same NRC entails no such substantive deficiencies.

The Second Circuit has not yet reviewed this precise question, but has issued a number of helpful pronouncements. "Although the TILA is a disclosure statute," the Circuit has reasoned, "its purpose is to require 'meaningful disclosure,' not 'more disclosure.'" *Turner*, 180 F.3d at 459 (quoting *Milhollin*, 444 U.S. at 568). Likewise, *Gambardella* has made clear that TILA does not require "perfect disclosure," but only "disclosure which clearly reveals to consumers the cost of credit." 716 F.2d at 117-118. It is difficult to guess how two identical NRC forms would "clearly reveal to consumers the cost of credit" whereas one form would not. It is true that Regulation Z specifies that "a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind," 12 C.F.R. § 226.23(b)(1), but it is also true that "perfect disclosure" is not the standard in this circuit. Even accepting the Karakuses' version of the facts, the Court finds that no plausible TILA claim on this point could lie unless it were to adopt a "perfect disclosure" standard and thus run afoul of *Gambardella* and *Turner*.

The district court in *Kahraman* reached the same conclusion on similar facts, rejecting

plaintiffs' claim that their receipt of one copy rather than two copies of the NRC entitled them to extend the rescission period to three years. 2012 WL 3258623 at *4-*5. In so holding, the court cited *Gambardella* and *Turner*, as well as a number of opinions from other jurisdictions directly rejecting similar claims. *See, e.g., Henderson v. GMAC Mortg. Corp.*, No. C05–5781RBL, 2008 WL 1733265, at *6 n. 5 (W.D. Wash. Apr. 10, 2008) (finding "simply no support [under TILA] for the claim that a technical failure to provide multiple copies of a document excuses a borrower from his end of the bargain"); *Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 821-22 (4th Cir. 2007) (declining to address "hyper-technical" violations of TILA, and stating in dicta that a lender had "substantially complied" by providing two copies of the notice—one for each borrower—rather than four). *See also Byron v. EMC Mortg. Corp.*, No. 3:09-CV-197-HEH, 2009 WL 2486816, at *4 (E.D. Va. Aug. 10, 2009) (rejecting plaintiff's TILA claim because, even "[a]ssuming she was able to prove that she received only one copy of the right to rescind notice, she would receive an unconscionable windfall if permitted to rescind for that technical error").

Of particular note is *King v. Long Beach Mortg. Co.*, 672 F.Supp.2d 238, 250-51 (D. Mass. 2009). There, the district court closely parsed the language of Regulation Z. It acknowledged the language in § 226.23(b)(1) requiring two copies of the NRC, but determined that "the rescission right is extended to three years only 'if the required *notice* or material disclosures are not delivered.'" *Id.* (citing 12 C.F.R. § 226.23(a)(3)) (emphasis added in *King*). "Significantly, the word 'notice' appears in the singular. Elsewhere in Regulation Z, the Federal Reserve Board has used the terms 'notices' or 'two copies of the notice' whenever it wished to convey that more than one notice is required." *King,* 672 F.Supp.2d at 250. This textual evidence underscores that neither Congress nor the Board intended to grant a borrower rescission rights

extending past the three-day window solely because she had received one copy of the NRC instead of two.[7]

It is true that a number of courts have permitted claims of this nature to proceed. *See, e.g., Marr v. Bank of America, N.A.*, 662 F.3d 963, 968 (7th Cir. 2011) ("This is not a situation in which there is any room for some kind of substantial compliance rule. Two copies means two copies, not one."); *Cooper v. First Gov't Mortg. and Investors Corp.*, 238 F.Supp.2d 50, 64 (D.D.C. 2002) (rejecting lender's "substantial compliance theory" on account of "the circuit and Supreme Court case law . . . favoring strict compliance with TILA");[8] *Stone v. Mehlberg*, 728 F.Supp. 1341, 1353 (W.D. Mich. 1989);[9] *Nicolaides v. Bank of America Corp.*, No. 10–1762, 2012 WL 2864468, at *3 (E.D. Pa. July 12, 2012). In general, these cases either assume without actually deciding that such claims are cognizable under TILA or appear in jurisdictions that follow the "hypertechnicality" standard, such as the Third and Seventh Circuits. In any case, in the Second Circuit, *Turner* and *Gambardella*—as well as the language of Regulation Z—are best

---

[7] *King* indicates that remedies other than rescission—namely, damages—may be available to borrowers who receive one NRC copy only. Because the Karakuses' claim for damages is time-barred, it is unnecessary to address that issue here. Nor is it necessary to discuss the Federal Reserve Board's power to adopt regulations penalizing creditors who singly or habitually violate the provision.

[8] In fact, *Cooper* does not cite any Supreme Court cases bearing on the issue of "strict compliance," but only one Third Circuit opinion and one opinion from the District of Rhode Island's bankruptcy court. *See Cooper*, 238 F.Supp.2d at 63 (citing *Griggs v. Provident Consumer Disc. Co.*, 680 F.2d 927, 930 (3d Cir.1982) and *In re Rodrigues*, 278 B.R. 683, 687 (Bankr. D. R.I. 2002)).

[9] *Stone* held that Regulation Z's two-form specification "is not a mere technicality," and that "[e]ffective exercise of the right to rescind obviously depends upon the delivery of one copy of the rescission form to the creditor and the retention by the obligor of the other copy." 728 F.Supp. at 1353. This is incorrect. To effectuate rescission, a lender need not deliver a copy of the NRC to the creditor, but need only "notify the creditor of the rescission by mail, telegram or other means of written communication." 12 C.F.R. § 226.23(a)(2).

interpreted to bar the Karakuses' claim as a matter of law.[10] Their claim is therefore dismissed on Wells Fargo's motion.

## IV. Plaintiffs' Credit Repair Claim

The Credit Repair Organization Act ("CROA"), 15 U.S.C. §§ 1679–79j, has two stated purposes:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b). In relevant part, CROA provides that "[n]o person may . . . make any statement . . . which is untrue or misleading . . . with respect to any consumer's credit worthiness, credit standing, or credit capacity to . . . any person . . . to whom the consumer has applied or is applying for an extension of credit." *Id.* § 1679b(a)(1). A violation of CROA entitles a plaintiff to "the amount of any actual damage sustained by such person." *Id.* § 1679g(a)(1).

The Karakuses allege that Lattanzi wrote in their loan application that Mrs. Karakus's monthly income was $10,500 and that she worked for Giovanni Bridal Design, when in fact she was unemployed at the time and had no income at all. (First Am. Compl. ¶¶ 85-86). "By having one employee falsify Mrs. Karakus's income and employment on her loan application," plaintiffs

---

[10] The holding here is not at odds with two prior cases in this jurisdiction ruling in the borrowers' favor: *Iannuzzi v. American Mortg. Network, Inc.*, 727 F.Supp.2d 125 (E.D.N.Y. 2010) and *Glucksman v. First Franklin Financial Corp.*, 601 F.Supp.2d 511 (E.D.N.Y. 2009). In those cases, the plaintiffs alleged that they had received zero copies of the NRC. The difference between zero and one copy of the required notice obviously implicates the substance of the borrower's disclosure; the difference between one and two copies, in this Court's judgment, does not.

protest, "Wells Fargo violated [CROA's] prohibition . . . against making false statements about the creditworthiness of a consumer who applies for financing." (*Id.* ¶ 88). As a result, they claim to have "suffered financial loss and mental anguish, and they face the prospective loss through foreclosure of the premises that are their home and investment property." (*Id.* ¶ 89).

Wells Fargo counters that CROA is not applicable because, as a bank, it "is not a 'credit repair organization.'" (Def. Mem. at 19 (citing *Henry v. Westchester Foreign Autos, Inc.*, 522 F. Supp. 2d 610, 613 (S.D.N.Y. 2007)). It contends that "credit repair business generally 'involves the marketing of credit repair services to consumers,' by which businesses lead consumers to believe 'that adverse information in their consumer reports can be deleted or modified regardless of its accuracy,'" (Def. Mem. at 19 (citing *Cortese v. Edge Solutions, Inc.*, No. 04-0956 (DRH) (ARL), 2007 WL 2782750, at *4 (E.D.N.Y. Sept. 24, 2007) (internal quotations and citations omitted)). It asserts, moreover, that CROA expressly exempts depository institutions from the statute's purview. (Def. Mem. at 19-20 (citing 15 U.S.C. § 1679a(3)(B)(iii) (stating that the term "credit repair organization" does not include "any depository institution (as that term is defined in section 1813 of Title 12)")).[11] *See, e.g., Tejada v. Countrywide Home Loans, Inc.*, No. 08-61979-CIV, 2009 WL 2046138, at *3 (S.D. Fla. July 9, 2009); *Hyppolite v. Citi Residential Lending, Inc.*, No. 08-62022-CIV, 2009 WL 1109320, at *3 (S.D. Fla. Apr. 24, 2009); *In re Wright*, No. 05-40829JJR13, 2007 WL 1459475, at *11 (Bankr. N.D. Ala. May 16, 2007) (all dismissing CROA claims against mortgage lenders because they were not "credit repair organizations").

The Karakuses retort that the language of § 1679b(a)(1) does not limit liability to credit repair organizations, but states broadly that "*no person*" shall make the kinds of untrue or

---

[11] That statute defines "depository institution" as "any bank or savings association." 12 U.S.C. § 1813(c)(1).

28

misleading statements that the section prohibits. (Def. Opp. Mem. at 41-42 (citing 15 U.S.C. §
1679b)(a)(1) (emphasis added)). *See, e.g., Poskin v. TD Banknorth, N.A.*, 687 F.Supp.2d 530,
542-43 (W.D. Pa. 2009) (holding that the phrase "no person" is broad enough to encompass
mortgage lenders such as the defendant). Wells Fargo responds that "no person" as it appears in
§ 1679b(a)(1) "'is to be understood to refer to persons acting on behalf of or in conjunction with
a credit repair organization,'" not to literally any person at all. (Def. Reply at 9 (citing *Berry v.
Cook Motor Cars, Ltd.*, Civ. No. AMD 09-426, 2009 WL 1971391, at *2 (D. Md. June 29,
2009))). *See Nixon v. Alan Vester Auto Grp., Inc.*, No. 1:07-cv-839, 2008 WL 4544369, at *7
(M.D.N.C. Oct. 8, 2008) (holding that "it was not Congress' intent to have the CROA apply to
all persons, whether they are associated with credit repair or not").

The lender further contends that the Karakuses' claim would fail in any event because an
entity cannot violate § 1679b(a)(1) by making a false statement to *itself*. As it points out, the
Karakuses' claim identifies Wells Fargo both as the "person" that made the allegedly untrue
statement about Mrs. Karakus's creditworthiness (through its agent Lattanzi), as well as the
"person" to whom the statement was made—the entity to which Mrs. Karakuses had applied for
an extension of credit. (Def. Mem. at 20 n.20; Def. Reply at 9-10). Wells Fargo cites two prior
cases—including one from this district—that have rejected such a reading of CROA. *See
Hayrioglu v. Granite Capital Funding, LLC*, 794 F.Supp.2d 405, 414-15 (E.D.N.Y. 2011)
("[T]he strained reading of the statute that the plaintiff advocates—where a false statement made
to one's self can be contrary to law—is inconsistent with the description of the statute's
purpose."); *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F.Supp.2d 885, 899 (N.D. Ill.
2009) ("The plain language of the statute prohibits a person from making false representations to
*another* about a consumer's creditworthiness or capacity.") (emphasis added). The Karakuses

again respond with a citation to *Poskin,* where the defendant bank had allegedly played a role in both falsifying and approving a loan application. (Pl. Opp. Mem. at 42-43 (citing *Poskin,* 687 F.Supp.2d at 536, 538)).

Although some authority exists for the Karakuses' proposition that "no person" should be read broadly enough to include mortgage lenders like Wells Fargo, this interpretation would run afoul of the purposes the statute was designed to achieve. Ultimately, it is a dispute that need not be resolved here, because the alternative argument advanced by Wells Fargo—that § 1679b(a)(1) does not establish liability based on a lender's untrue statements *to itself*—is wholly persuasive. It is hard, in short, to accept that Congress intended CROA to impose liability on an entity based on purely internal communications. Any other interpretation of the statute would defy common sense, ignore the "elemental principle of statutory construction that an ambiguous statute must be construed to avoid absurd results," *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007), and disregard the statute's goal of protecting the public from unfair or deceptive advertising and business practices by credit repair organizations.

In this regard *Hayrioglu, Whitley,* and *Kahraman* offer strong support for this conclusion. *See, e.g., Kahraman,* 2012 WL 3258623, at *7 ("[O]verstating an applicant's income as part of an internal loan approval process does not alone constitute a violation of 15 U.S.C. § 1679b(a)(1)."). While plaintiffs assert that *Poskin* supports their position, defendant correctly notes that the issue was never properly raised in that case. (Def. Reply at 9-10). And, to the extent *Poskin does* advance the Karakuses's stance, the Court finds it unpersuasive. For these reasons, plaintiffs fail to state a claim under CROA; Wells Fargo's motion to dismiss is granted.[12]

---

[12] The parties' briefs overlook the obvious fact that the "person" formally making the statement

## V. Deceptive Business Practices

### a. DPA framework

Under § 349(h) of New York's General Business Law (otherwise known as the Deceptive Practices Act, or DPA), a consumer may state a cause of action for damages if he can show that a defendant has engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 911 N.E.2d 834, 883 N.Y.S.2d 772 (2009). To qualify as "consumer-oriented conduct," a defendant's acts or practices "need not be repetitive or recurring," but "must have a broad impact on consumers at large; private contract disputes unique to the parties . . . would not fall within the ambit of the statute." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 320, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995) (internal quotations omitted). "Materially misleading conduct" is that which is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995). And "while the statute does not require proof of justifiable reliance," a plaintiff seeking damages must show that the defendant's conduct "caused actual, although not necessarily pecuniary, harm." *Id.* at 26. *See also Morrissey v. Nextel Partners, Inc.*, Case No. 3194-06, 22 Misc.3d 1124(A), 880 N.Y.S.2d 874 (Table), 2009 WL 400030, at *5 (Sup. Ct., Albany Cnty., Feb. 19, 2009) (explaining the distinction between reliance and causation in the context of DPA).

---

to the lender was actually Mrs. Karakus, who, as she alone could do, adopted, signed, and tendered the loan application to Wells Fargo. In light of the Court's disposition of the motion, it does not address the significance of this fact.

31

### b. *The Claim Against Wells Fargo*

The Karakuses accuse Wells Fargo of employing a host of deceptive practices in the course of negotiating and closing on both the mortgage refinancing and home equity loans. In their proposed second amended complaint, plaintiffs list eight separate actions that they believe were "unfair, deceptive, and contrary to public policy and generally recognized standards of business." (Prop. Second Am. Compl. (Dkt. No 39, Exh. E) ¶ 69). Plaintiffs claim that these "deceptive practices" were "widespread," and "have affected many borrowers and consumers, not just Mr. and Mrs. Karakus." (*Id.* ¶ 70). As evidence, they refer to various accusations, lawsuits, and fines levied against Wells Fargo by others on account of its alleged predatory lending practices. (*Id.*). Plaintiffs also claim that these acts have injured them by causing damage to their credit and driving their home into foreclosure. (*Id.* ¶ 72). Finally, they argue that Deutsche Bank should be liable under DPA as assignee of the mortgage refinancing loan because "it was aware of, or should have been aware of, the deceptive practices that Wells Fargo had used to make the loan." (*Id.* ¶ 71).

Wells Fargo demurs that none of the activities alleged were actually "consumer-related" or linked to any "broader impact on consumers at large," but were merely part of a "single-shot private contract dispute unique to the parties." (Def. Mem. at 10-11 (internal quotations omitted)). It further argues that plaintiffs fail to show "injury to the public at large" ensuing from the allegedly unlawful practices. (*Id.* at 12). (*See* Def. Reply at 6 (citing *Hayrioglu*, 794 F.Supp.2d at 410 (rejecting a nearly identical DPA claim because plaintiffs did not link the deceptive practices to any tendency on the lender's part to "actively and broadly solicit[] consumers"))). Moreover, it opposes plaintiffs' motion to amend their complaint a second time

32

to provide "evidence of Wells Fargo's widespread malfeasance" and to specify the injuries to themselves and to the public at large. (Def. Reply at 5-6).

While the parties focus primarily on whether the alleged conduct was sufficiently "widespread" and "consumer-oriented," that is a moot issue in light of a more basic consideration: whether any of the eight alleged actions qualify as "materially misleading" conduct under the standard articulated by the New York Court of Appeals in *New York University*, 87 N.Y.2d at 320. None do. Guidance and support for this holding is found in two recent cases—one from this district and the one from the Second Department—with fact patterns closely allied to those *here*. See *Hayrioglu*, 794 F.Supp.2d at 410-413; *see also Patterson v. Somerset Investors Corp.*, 96 A.D.3d 817, 817-18, 946 N.Y.S.2d 217, 217-18 (2d Dep't 2012).

Specifically, plaintiffs' first DPA allegation is that Wells Fargo "told Mrs. Karakus she could afford the monthly payments on her [two] loans, when in fact the payments were beyond her means." (Prop. Second Am. Compl. ¶ 69(a)). But a "reasonable consumer" should know the state of her own finances and whether or not she can afford a certain monthly loan payment. The documents Wells Fargo provided to the Karakuses at closing made clear what these monthly amounts would be. (*See* McKenney Decl., Exhs. J, L (describing the loans' total amounts, finance charges, interest rates, monthly payments, and the final balloon payment for the home equity loan)). A borrower who simply accepts another party's assertions that she will be able to afford clearly stated monthly fees acts unreasonably if she cannot, in fact, afford those payments. *See Patterson*, 96 A.D.3d at 817 (rejecting a DPA claim because "the terms of the subject mortgage loan were fully set forth in the loan documents, and . . . no deceptive act or practice occurred"); *Hayrioglu*, 794 F.Supp.2d at 413 ("[T]he fact that the plaintiff sought and received a

33

loan he could not afford does not mean that he can now proceed on a Section 349 claim against the party that made his mistake possible.").

Nor do plaintiffs plead or seek to plead any facts indicating that Wells Fargo took unlawful or improper steps to prevent Mrs. Karakus from reading the loan documents before signing them. She alleges, of course, that, at closing, she and her husband "were told that there were a lot of closings scheduled for that day, so we would have to sign our loan documents quickly," and, as a consequence, had no time to read any of the documents they signed. (Decl. of Lale Karakus (Dkt. No. 24) ¶ 9-10). This allegation is not nearly sufficient to overcome the principle that a reasonable consumer, at least in New York, is expected to read and be familiar with the terms of a document she signs. *See Patterson*, 96 A.D.3d at 817 ("The plaintiff's claim that he did not read the documents before executing them is unavailing, since a party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms.") (internal quotations omitted); *see also Hayrioglu*, 794 F.Supp.2d at 410-413 (rejecting an identical argument because the plaintiff "knew or should have known that his monthly income was substantially less than" the loan amounts stated in his closing documents, regardless of his alleged inability to read English).

Next, plaintiffs claim that "in filling out Mrs. Karakus's loan application, Wells Fargo deliberately created a fictitious monthly income of $10,500 and fictitious employment at Giovanni Bridal Design for her." (Prop. Second Am. Compl. ¶ 69(b)). *Hayrioglu* dispatched precisely the same type of claim on the grounds that the "plaintiff [could not] plausibly assert that he *believed* [the lender's] misstatement of his own income." 794 F.Supp.2d at 411. The same conclusion is well supported here. In fact, the income figure was based on a job that Mrs. Karakus had to know was fictitious. Moreover, the misrepresentation was not a statement made

34

by Wells Fargo to Mrs. Karakus, but quite the opposite: it was included in a loan application submitted *to* Wells Fargo that Mrs. Karakus herself signed. (*See* McKenney Decl., Exh. M). Although Wells Fargo's employee Lattanzi allegedly supplied the incorrect information on the form, there can be no claim that this act was misleading to, or directed at, consumers, since the sole recipient of the application was Wells Fargo itself. It is not a cognizable claim under DPA.

The Karakuses' next allegation is that, while the promissory note for the home equity loan made clear that it was a fixed-rate loan, the TILA disclosure statement included language indicating that "[y]our loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier." (Prop. Second Am. Compl. ¶ 35; *see also id.* at ¶ 69(c), McKenney Decl., Exhs. C, L). But, the fact that Wells Fargo submitted contradictory information does not mean its conduct was "materially misleading." Plaintiffs do not explain how Wells Fargo could gain some unfair advantage by negotiating a fixed-rate loan with a borrower and clearly disclosing the interest rate, but then providing a disclosure statement at the closing ceremony stating the mortgage includes a variable rate feature.

Furthermore, although a DPA plaintiff need not show "reasonable reliance" on the allegedly misleading or deceptive conduct, she must demonstrate a causal link between the conduct and the injury she claims to have suffered. *See Marine Midland Bank, N.A.*, 85 N.Y. 2d at 25. Here, plaintiffs provide no facts linking the disclosure statement's alleged error with either of the two injuries they claim to have suffered: damage to their credit and the foreclosure of their home. Plaintiffs do not claim, for instance, that the allegedly incorrect statement had any actual effect on their decision to enter into the loan, on Wells Fargo's approval of their loan, or on their later inability to make payments on the loan. In fact, Mrs. Karakus has affirmed that she did not

even *read* the disclosure statement (nor *any* of the document she signed) at closing. (*See* Decl. of Lale Karakus ¶ 10). Causation is therefore lacking, and the claim fails on that ground.

Plaintiffs move on to assert that "Wells Fargo did not require documentation of Mrs. Karakus's income, such as pay stubs, tax returns, or bank statements." (Prop. Second Am. Compl. ¶ 69(d)). This is not a misleading or deceptive act directed at consumers; the omitted materials would have been relevant only to Wells Fargo itself in determining whether to grant or deny the loan application. *Hayrioglu* against comes to the fore: "The plaintiff cannot plausibly assert that. . . [the lender's] alleged failure to request documentation of [her] income mislead [her] about [her] own income level." 794 F.Supp.2d at 411. This allegation affords no basis for a DPA claim.

The Karakuses also contend that Wells Fargo "knew that the only way that [the plaintiffs] could afford [the loans] would be for them to sell or refinance their property [later]," a practice that they allege "is called *asset-based lending* and is improper." (Prop. Second Am. Compl. ¶ 69(e) (emphasis in original)). Plaintiffs provide no authority suggesting that asset-based lending is *per se* improper under New York or federal law, nor do they allege that Wells Fargo concealed the nature of the loans to them. On the contrary, they claim that Wells Fargo told them explicitly that the loans were based on their home equity. (*See id.* ¶ 69(f)). The Second Department has squarely held that a lender that extends an asset-based home mortgage loan to a borrower does not violate DPA if it fully discloses the terms of the loan, absent other allegations of misleading or deceptive conduct. *See Emigrant Mortg. Co., Inc. v. Fitzpatrick*, 95 A.D.3d 1169, 1171-72, 945 N.Y.S.2d 697, 700-01 (2d Dep't 2012). The precedent is sound. The Karakuses do not plead or seek to plead any additional misconduct, and this claim is dismissed.

Plaintiffs next interpose that, to induce them to take out the loans, Wells Fargo "falsely assured Mrs. Karakus that housing prices would keep rising, so that in a year or two, it claimed, she could sell her house at a profit or refinance it." (Prop. Second Am. Compl. ¶ 69(f)). Apart from simply claiming that this statement was "false," the Karakuses have not pleaded facts showing that their house has *not* increased in value, nor that they were (prior to foreclosure) unable to sell it for a profit or refinance it. Assuming, however, that their home value has not risen, the "assurance" the Karkauses were given is still no basis for a DPA charge. The "reasonable consumer" standard is the analytical lodestar, and a reasonable consumer, based on ordinary and common experience, should be aware that housing prices can fluctuate and are not impervious to downturns. To simply accept uncritically a bank employee's speculations about housing values into the future, and then to label his statements false after the housing market follows a different course, is not reasonable. A borrower who does so cannot assert a DPA claim without further allegations of misconduct, and nothing more is alleged. The claim is dismissed.

The Karakuses additionally aver that "Wells Fargo never explained to Mrs. Karakus that her $210,000 loan would have a balloon payment." (Prop. Second Am. Compl. ¶ 69(g)). Yet, the terms of the balloon payment are stated clearly in multiple documents that Mrs. Karakus signed. (*See, e.g.*, McKenney Decl., Exh. C at 2 ("On 11-20-2021, I will pay a final balloon payment equal to the unpaid Principal plus all remaining interest, fees and other sums owed under this Note and the Security Instrument."); *see also* Exh. L at 1 (showing a one-time payment for $167,583.79 due on 11-20-2021)). As discussed *supra*, a reasonable consumer is responsible for reading and familiarizing herself with the terms of an agreement she freely enters into. Mrs. Karakus entered into the loan agreements of her own accord. She alleges nothing that suggests

37

the lender acted in any manner inconsistent with the terms of that provision. No deceptive business practice claim is stated.

The Karakuses next contend that Wells Fargo violated DPA because the home equity loan (with an interest rate two percent higher than the rate for the mortgage refinancing loan) accounted for 44% of Mrs. Karakus's total indebtedness, as opposed to the more standard 20%. (*See* Prop. Second Am. Compl. ¶ 69(h)). Because they believe a smaller-sized loan would have adequately collateralized Wells Fargo, the Karakuses contend that it was therefore "improper for Wells Fargo to make the second loan for 44% of Mrs. Karakus's total indebtedness." (*Id.*). Once again, however, there is no allegation of deception by Wells Fargo. Mrs. Karakus was fully aware of the value of each loan at the time she decided to sign the closing papers. She may now regret her decision, but that is of no moment as far as DPA goes. She has no claim under the statute for accepting a home equity loan that, in hindsight, has apparently proved too large.

Finally, the Karakuses allege broadly that "Wells Fargo lent to Mrs. Karakus as part of a scheme that it had to make as many mortgage loans as possible, including loans to borrowers who could not afford its loans, so that Wells Fargo could profit by selling the loans—including its bad loans and high-risk loans—to investors." (*See* Prop. Second Am. Compl. ¶ 69(i)). This is precisely the kind of conclusory allegation that cannot survive a motion to dismiss under *Twombly* and *Iqbal. See Twombly*, 550 U.S. at 556-57; *Iqbal*, 556 U.S. at 678. While plaintiffs cite various accusations, lawsuits, and fines levied against Wells Fargo on account of its alleged predatory lending practices, (*see* Prop. Second Am. Compl. ¶ 70), they fail to plead facts that actually demonstrate how Wells Fargo's conduct *in this lending* would have been "likely to mislead a reasonable consumer acting reasonably under the circumstances." Furthermore, even if plaintiffs could properly attest to the existence of a widespread predatory lending scheme, their

38

complaint would still be devoid of facts linking Wells Fargo's actions in this particular case to any larger scheme to defraud consumers. Whatever statutes, rules, or regulations Wells Fargo may have violated in its lending practices, nothing in the Karakuses' pleadings, current or proposed, suggests that Wells Fargo violated DPA in any regard in its dealings with them.

To be clear, the Court does not overlook plaintiffs' citation to six cases in which DPA claims based on predatory lending practices were not dismissed. *See* Pl. Opp. Mem. at 21-22 (*citing Williams v. Aries Financial, LLC*, No. 09–CV–1816 (JG) (RML), 2009 WL 3851675, at *1-*2, *10 (E.D.N.Y. Nov. 18, 2009); *Barkley v. Olympia Mortg. Co., et al.*, No. 04–CV–875 (RJD) (KAM), 2007 WL 2437810, at *18 (E.D.N.Y. Aug. 22, 2007); *M & T Mortg. Corp. v. Miller*, 323 F. Supp.2d 405, 408 (E.D.N.Y. 2004); *Popular Fin. Serv., LLC v. Williams*, 50 A.D.3d 660, 660-61, 855 N.Y.S.2d 581, 582 (2d Dep't 2008); *Delta Funding Corp. v. Murdaugh*, 6 A.D.3d 571, 572, 774 N.Y.S.2d 797, at **2 (2d Dep't 2004); *Cruz v. HSBC Bank, N.A.*, No. 100629-2008, 21 Misc. 3d 1143(A), 2008 WL 5191428, *1-*2 (Sup. Ct., Richmond Cnty. 2008)). They are entitled to little weight on the motions before the Court. Plaintiffs in *Hayrioglu* cited these exact six cases, but as the court there explained, none of the six reported factually analogous situations. Two cases—*Popular Financial Services* and *Murdagh*—provided no relevant discussion of the facts, while each of the other four "describe[d] a broad scheme involving affirmative efforts to mislead home purchasers about the condition of the homes being sold, the terms of their loans, or the lenders' interests." *Hayrioglu,* 794 F.Supp.2d at 411. These cases also involved a large network of actors working in concert to mislead consumers.

The Karakuses plead no facts showing that Wells Fargo operated a scheme of any kind, much less a scheme similar to the ones described in *Aries Financial, Barkley, Miller*, and *Cruz*. On the contrary, Wells Fargo disclosed all the relevant terms of the loan agreements to the

39

Karakuses in writing. The closest factual analog is *Hayrioglu*, and with guidance from *Patterson*, the Court finds that case's reasoning persuasive. Therefore, the Court holds that plaintiffs fail to state a claim under DPA, regardless of whether or not Wells Fargo's actions were "consumer-oriented." For these reasons, leave to amend with respect to the DPA claims is denied and the motion to dismiss these claims is granted.

## VI.    Fraudulent Inducement

### a. *Framework for Claims*

Under New York law, a party claiming fraudulent inducement must "establish the basic elements of fraud, namely [1] a representation of material fact, [2] the falsity of that representation, [3] knowledge by the party who made the representation that it was false when made, [4] justifiable reliance by the plaintiff, and [5] resulting injury." *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276, 952 N.E.2d 995, 1000, 929 N.Y.S.2d 3 (2011) (internal quotations omitted). The Karakuses charge that Wells Fargo fraudulently induced Mrs. Karakus to enter into the loan agreements, and cite nine separate bases for this claim.[13] However, even in light of the additional material in the proposed second amended complaint, the Karakuses's fraudulent inducement claim would still fail, since none of the plaintiffs' factual assertions support such a cause of action.

To start, plaintiffs allege that Wells Fargo committed fraud because Lattanzi listed fictitious employment and income for Mrs. Karakus on the loan application he filled out for the Karakuses. (*See* Prop. Second Am. Compl. ¶ 93(a)). At the same time, nowhere do they claim

---

[13]  Plaintiffs also propose a novel theory of fraud based on general allegations that Wells Fargo was operating a "scheme to make as many mortgage loans as possible to subprime and other borrowers who could not afford their loans, so that Wells Fargo could sell the bad loans to investment trusts." (Pl. Opp. Br. at 27). Because these assertions do not conform to the particularity requirements of Rule 9(b), the Court does not address them separately, but only in the context of the nine specific allegations. *See* Fed. R. Civ P. 9(b).

40

that they relied on this alleged misrepresentation; instead, they aver that the fictitious information

"was intended to fool *a prospective buyer*" of those loans. (*Id.* (emphasis added)). *America Movil*

makes plain that a fraud claim requires "justifiable reliance *by the plaintiff*." 17 N.Y.3d at 276

(emphasis added). In *Deutsche Bank Natl. Trust Co. v Sinclair*, 68 A.D.3d 914, 916, 891

N.Y.S.2d 445 (2nd Dep't 2009), the Second Department rejected a borrower's fraud claim

against a broker who had allegedly overstated one spouse's income to procure loans, since "such

misrepresentations were not made to the [plaintiffs] for the purpose of inducing *their reliance*."

(emphasis added). The Karakuses cite no New York cases, nor is the Court aware of any, that

would permit a plaintiff to sue for fraud based on a third-party's putative reliance rather than his

own.

Next, plaintiffs spotlight Lattanzi's statement that Mrs. Karakus could afford the monthly

loan payments "because home prices were rising continually . . . Wait a year or two, he

counselled , then refinance. 'Don't worry about employment,' he counselled. 'As long as your

credit is good, I'll help you.'" (Prop. Second Am. Compl. ¶ 93(b)). As is obvious from the mere

recitation, Lattanzi's remark was not a material misstatement, but was nothing more than a

prediction about future housing prices, as well as an offer for future assistance should the

Karakuses wish to refinance again. New York courts have made manifest that "speculation and

expressions of hope for the future . . . are not actionable representations of fact" under common

law theories of fraud. *Alikes v. Griffith*, 101 A.D.3d 1597, 956 N.Y.S.2d 354, 356 (4th Dep't

2012) (internal quotations omitted). Lattanzi's statement was inherently speculative, and cannot

undergird a fraud claim.

It is true, on the other hand, that a plaintiff *may* base a fraud claim on a statement of

future intention if she can "allege facts sufficient to show that the promisor, at the time the

41

representation was made, never intended to honor the promise." *Pope v N.Y. Prop. Ins. Underwriting Assn.*, 66 N.Y.2d 857, 859, 489 N.E.2d 247, 247, 498 N.Y.S.2d 360 (1985). Yet, the Karakuses have alleged no facts to suggest that either Lattanzi or Wells Fargo ever *intended* for housing prices to drop, or *intended* not to assist the Karakuses in refinancing their home again in the future, should their credit remain strong. In fact, they have not even alleged that the value of their home *has* decreased, or that Wells Fargo refused to help them refinance their loans subsequently in spite of good credit.[14] (*See, e.g.*, Prop. Second Am. Compl. ¶ 30). Hence, cases such as *Thayer v. Dial Indus. Sales, Inc.*, 85 F.Supp.2d 263, 273 (S.D.N.Y. 2000) and *Chase Manhattan Bank, N.A. v Perla*, 65 A.D.2d 207, 210, 411 N.Y.S.2d 66 (4th Dep't 1978), which plaintiffs cite, are inapposite. Lattanzi's statements are not actionable on a fraudulent inducement theory.

Moving on, the Karakuses assert that, in order to "encourage Mrs. Karakus to take out her Wells Fargo loans, Lattanzi assured her, 'Don't worry about numbers; I'll come up with them.'" (Prop. Second Am. Compl. ¶ 93(c)). Even the Karakuses admit that this is not a false statement: they go on to state that Lattanzi "kept his word" on this count by creating allegedly false employment and income for Mrs. Karakus on the loan application. As just discussed, those alleged misrepresentations cannot support a fraud claim, nor can Lattanzi's apparently *true* statement about his intention to "come up with" those numbers.

Plaintiffs further contend that Wells Fargo committed fraud because "Lattanzi never told Mrs. Karakus that her $210,000 loan would have a balloon payment at the end." (Prop. Second Am. Compl. ¶ 93(d)). It is a familiar and meritless theme. The terms of the balloon payment were unambiguously provided in the closing documents Mrs. Karakus signed. She cannot now

---

[14] On the contrary, plaintiffs allege that their credit has suffered as a result of the loans. (*See* Prop. Second Am. Compl. ¶ 101).

claim that she justifiably relied on Lattanzi's mere silence to mean that there would be no such balloon payment. Even if Lattanzi had stated that there would be no balloon payment, the written agreement would still control for the purposes of a fraud claim. *See, e.g., N.Y. State Urban Development Corp. v. Marcus Garvey Brownstone Houses, Inc.*, 98 A.D.2d 767, 469 N.Y.S.2d 789, 795 (2d Dep't 1983) ("In the face of the outstanding conflict between the alleged oral representations and the uncontroverted documentary evidence containing the written terms of the [agreements] . . . , appellant cannot claim justifiable reliance" for the purposes of fraudulent inducement); *see also Marine Midland Bank v Embassy E.*, 160 A.D.2d 420, 422, 553 N.Y.S.2d 767 (1st Dep't 1990) ("It is no defense that respondents did not read the note or the guarantees, for the law presumes that one who is capable of reading has read the document which he has executed and he is conclusively bound by the terms contained therein.") (internal citations omitted).

Plaintiffs parry that Mrs. Karakus could not have read the closing documents because "[s]he had to sign too many papers, people hurried her to sign them, and she is a Turkish immigrant with only a high-school education so that she did not know what to look for in the loan documents." (Pl. Opp. Mem. at 33). This argument is unavailing. Mrs. Karakus—who is ostensibly fluent in English—did not have to yield to those who allegedly "hurried her to sign;" she was perfectly capable of reading the agreement before affixing her signature. If the terms of the agreement were too confusing, she could also have hired an attorney or financial specialist to review them for her. *Cf. Hayrioglu*, 794 F.Supp.2d at 410 (rejecting a fraud claim in part because a borrower who claimed to speak no English "was affirmatively obligated to ask for assistance in understanding" the documents he signed).[15] Lastly, of course, Mrs. Karakus could have

---

[15] Plaintiffs' citation to *In re Walker*, 183 B.R. 47, 48-49 (Bankr. W.D.N.Y. 1995) is misplaced.

requested an adjournment of the closing to another day in order to devote proper scrutiny to the closing documents.

Plaintiffs' next allegation is that "Lattanzi told Mrs. Karakus that, in order for her to qualify for her loans, her house would have to be appraised at $525,000." (Prop. Second Am. Compl. ¶ 93(e)). Plaintiffs then effectively disclaim any reliance on this statement: they assert that Mrs. Karakus "thought then that in light of what she knew about how much houses in her neighbourhood were selling for, $525,000 was more than her house was worth." (*Id.*) Mrs. Karakus could not justifiably rely on a statement that she believed was untrue when she heard it. Moreover, plaintiffs indicate no causal link between the statement and the injuries they claim to have suffered. As best the Court can discern, Lattanzi's alleged remark (as distinguished from the home value actually set forth in the loan application) had no bearing on Wells Fargo's approval of the loan, the parties' execution of the closing documents, the Karakuses' inability to pay their mortgage, or their subsequent financial difficulties.

The Karakuses then argue that "Wells Fargo mistitled Mrs. Karakus's loan application," which they claim "was not an application at all, since she did not sign it until the day of her loan's closing. Rather, the document was intended to justify Wells Fargo's decision to lend to Karakus, at a time when the lender had already made the decision." (Prop. Second Am. Compl. ¶ 93(f)). This allegation falls far short of the mark. Regardless of when the application was signed, it was exactly what it claimed to be, even if it served merely as a formality: a copy of Wells Fargo's "Uniform Residential Loan Application." (*See* McKenney Decl., Exh. M). There

---

In that case, a borrower who was *defending* himself against a claim that he had filed a falsified loan application argued that he had not actually read the document, and thus lacked the requisite "intent to deceive." That holding has no bearing on a situation such as this one, in which a borrower is *asserting* a fraud claim against a lender.

44

is no material misrepresentation here, nor is there any allegation of reliance by the Karkauses on this alleged "misstatement" or any causal link to injuries.

Up next is an assertion essentially duplicative of plaintiffs' initial assertion: that Wells Fargo committed fraud by supplying a fictitious employment and income for Mrs. Karakus on the loan application that she signed. (Prop. Second Am. Compl. ¶ 93(g)). This allegation fails to state a claim for fraud for the same reasons the first allegation did.

Plaintiffs also claim that Wells Fargo's approval of Mrs. Karakus as a borrower "constituted a statement by Wells Fargo that it had examined Mrs. Karakus's creditworthiness and determined that she could afford her two loans." (Prop. Second Am. Compl. ¶ 93(h)). They contend that this "statement" was false "because it was based on Gene Lattonzi's [sic] falsely exaggerating Mrs. Karakus's income, inventing employment for her, and inflating her home's value." (*Id.*). This argument truly strains credulity. An approval of a loan is an action, not a statement of fact. To the extent that it was a "statement," it was simply an acknowledgement that Wells Fargo had determined that the Karakuses could pay the loans back and felt comfortable that it had sufficient security in case they could not. Furthermore, plaintiffs actively sought out these loans from Wells Fargo. To now bring an action for fraud against Wells Fargo because it did not reject their loan application smacks of chutzpah.

Finally, the Karakuses claim that "Lattanzi never told Mrs. Karakus that Wells Fargo intended to sell the $265,000 and $210,000 loans that it approved for her, so Mrs. Karakus was unaware that it did not matter to Wells Fargo if she defaulted on her loans." (Prop. Second Am. Compl. ¶ 93(i)). Once again, these allegations fall far short of a cognizable claim for fraud. Plaintiffs fail to state that Wells Fargo only sold the mortgage refinancing loan, not the home equity loan, and they plead no facts even intimating that Wells Fargo *knew* at the time of closing

45

that it planned to sell the mortgage refinancing loan to Deutsche Bank nearly three years into the future. Plaintiffs also fail to cite any law indicating that Wells Fargo would have had an obligation to disclose such plans even if it had formulated them as of the closing date. And, plaintiffs surely cannot believe that "it did not matter to Wells Fargo" if Mrs. Karakus defaulted on her loan, even given the security interest the lender retained in the property: a mortgage that was generating a regular stream of interest payments would have been much more valuable to a prospective purchaser than the underwater mortgage Wells Fargo ended up selling to Deutsche Bank.

Accordingly, all of plaintiffs' bases for a fraudulent inducement claim fail as a matter of law. Because none of the new allegations that appear in plaintiffs' proposed second amended complaint supply the factual content needed to state a plausible cause of action for fraudulent inducement, leave to assert them is denied, and the motion to dismiss that claim in its entirety is granted.

## CONCLUSION

For the reasons stated above, Deutsche Bank is joined as a defendant in this matter on plaintiffs' cross-motion. Plaintiffs' cross-motion to amend their complaint a second time is granted to the extent that it joins and alleges claims against Deutsche Bank and enhances their factual allegations that Wells Fargo failed to clearly and conspicuously disclose the effects of rescinding the mortgage refinancing loan. In all other respects, plaintiffs' cross-motion to amend is denied on the grounds of futility. Wells Fargo's motion to dismiss is granted, although plaintiffs' TILA claim regarding the mortgage refinancing loan survives as against Deutsche Bank only. Plaintiffs are granted 30 days leave from the entry of this Order on the docket to

46

serve process, along with their second amended complaint, on Deutsche Bank. Failure to do so will result in dismissal of the entire action with prejudice.

SO ORDERED.

s/ ENV

ERIC N. VITALIANO
United States District Judge

Dated: Brooklyn, New York
       April 19, 2013